**GENERAL INSTRUMENT CORPORA-TION, Appellant,**

v.

**The UNITED STATES, Appellee.**
**Customs Appeal No. 5480.**

United States Court of Customs and Patent Appeals.
July 12, 1973.

Eugene L. Stewart, Lincoln & Stewart, Washington, D. C., attys. of record, for appellant.

Harlington Wood, Jr., Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, James Caffentzis, New York City, for United States.

Before MARKEY, Chief Judge, RICH, BALDWIN, and LANE, Associate Judges, and ALMOND, Senior Judge.

LANE, Judge.

This is an appeal from the decision and judgment of the United States Customs Court, 67 Cust.Ct. 127, C.D. 4263 (1971) overruling the importer's protest against the denial of an allowance under Itm 807.00 TSUS for certain products of the United States constituting parts of electrolytic capacitors imported from Taiwan. Allowance was made for certain other American-made parts, and there is no dispute as to them. The capacitors were classified under the provision for electrical capacitors in Item 685.80 TSUS, and that classification is not disputed. We reverse the decision of the Customs Court.

Item 807.00, as amended by Section 85, Tariff Schedules Technical Amend-

ments Act of 1965 (Pub.L. 89–241) reads:[1]

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, *for the purpose of such assembly and return to the United States,* (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting ............................A duty upon the full value of the imported article, less the cost or value of such products of the United States * * *

Two general types of electrolytic capacitors are involved, a tubular 729 series capacitor and a subminiature 974 series capacitor. The following simplified description by appellant was incorporated in the Customs Court's opinion:

The assembly of a capacitor is essentially a simple process in which a sandwich is made out of two metal foils with paper in between. This assembly is then rolled up and immersed in an electrolyte [chemical solution], and placed in a can with electrical connections.

More specifically, each electrolytic capacitor comprises a complete capacitor roll disposed in a cylindrical aluminum can with wire terminal leads at each end. Allowance was permitted for the aluminum can, a bakelite washer, an aluminum rivet and wire leads, all associated with the assembly of the capacitor roll into the can. The parts in dispute relate to the earlier operation of forming the capacitor roll.

Using the 729 series capacitor as representative and considering only operations involving disputed parts, the production of the capacitor roll in Taiwan involves (1) cutting the anode foil to a specified length from the roll as importer, (2) cutting an anode tab to length from a roll of material, (3) staking the anode tab to the cut anode foil at right angles thereto,[2] (4) interleaving paper and cathode foil from rolls with the anode foil strip and winding them into a roll with the paper between the cathode and anode foils, (5) staking a previously cut cathode tab to the cathode foil at right angles thereto, (6) placing a length of plastic film under the anode tab, (7) adding two or three turns to the rolled-up assembly and then cutting the interleaved paper and cathode foil from the rolls, (8) securing the rolled-up paper and foil assembly against unwinding by applying cellophane tape from a dispenser, (9) immersing the rolled-up assembly in a liquid electrolyte solution, (10) removing the capacitor roll from the electrolyte and welding the cathode lead to the inside of the can, (11) attaching the anode tab to the inside of a previously made rivet and washer assembly and (12) inserting the rolled-up as-

---

1. TSUS Item 807.00 was further amended effective the 120th day after November 10, 1966, the date of enactment of Public Law 89–806, by deleting the italicized language set forth in the quoted text of TSUS Item 807.00. The merchandise in the case at bar was imported at New York, New York, on January 29, 1967, and it is therefore Item 807.00 as amended in 1965 which governs the present case.

2. This staking comprises piercing the tab and foil in assembled relationship by a series of pins which flare the material and then pressing to flatten the flared portion and cause the foil and tab to adhere to each other.

sembly in the can thus finishing the capacitor.

The articles in issue are the anode foil, the cathode foil, the paper, the metal tabs, the plastic insulating film and the cellophane tape. All of these are products of the United States and were exported to Taiwan in rolls. The rolls of the cathode foil, anode tab, cathode tab, paper, cellophane tape and plastic insulation were always exported in the width at which they were used in the capacitor. They only had to be cut to length during assembly of the capacitor in Taiwan. The anode foil was initially also exported in the width used. However, it was discovered that the edges were frequently damaged in handling before use due to the fragile characteristics of the material. The foil was then exported at a "master roll width" which was wider, and the edges were trimmed to bring it to the proper width in Taiwan.

The court held that the facts and issues in this case are essentially the same as in Amplifone Corp. v. United States, 65 Cust.Ct. 58, C.D. 4054 (1970), wherein the Customs Court construed the language "fabricated components * * * which * * * were exported in condition ready for assembly without further fabrication" appearing in item 807.00. In that case, the court espoused a theory respecting item 807.00 which distinguished a *single* assembly process wherein a given article would be directly incorporated or assembled into the ultimate merchandise from a *dual* assembly process wherein a given product of the United States would first be incorporated into a subassembly and the subassembly incorporated or assembled into the ultimate merchandise for exportation. In *Amplifone*, the court held, "[A]s we read item 807.00 it does not contemplate two or more assembly processes abroad with respect to American articles *vis-a-vis* the imported article."[3] The court's conclusion in *Amplifone* was that a "fabricated component" had to be a

"complete" unit itself and not subject to any assembly other than directly into the final product to be exported.

Applying the *Amplifone* reasoning to the facts of the present case, the court below treated the disputed articles as components of the capacitor *roll*, and the capacitor roll as a subassembly of the ultimate capacitor. The court concluded that the disputed articles were subject to *dual* assembly and, therefore, were not fabricated components within the meaning of item 807.00 of the exported products. The court specifically stated the following:

> In this case the evidence as noted above clearly shows that the assembly of the imported capacitors in Taiwan *awaits* the creation there of a capacitor roll. And the capacitor roll is the component produced or created with the exported articles in dispute in the instant case. Therefore, since the capacitor roll component is made in Taiwan the materials of its composition are not, at the time of exportation from the United States, components of the imported capacitors, but rather are at that time materials with which a component of said capacitors, namely, the capacitor roll, is yet to be produced. Indeed, plaintiff's own expert witness, while he did not identify a particular component as we do here, labeled the disputed articles as "component materials."

## OPINION

■■ We reject the rationale of the Customs Court in this case and the *Amplifone* case. We think the artificial single assembly-dual assembly distinction as determinative of classification under item 807.00 is unreasonably restrictive and is not warranted by the statute. The inquiry under item 807.00 should not focus on the identification of possible sub-units of the whole product and the relationship between the disputed element and such sub-units. Instead, classification under item 807.00 depends

3. 35 Cust.Ct. at 64.

upon the relationship of the disputed element to the whole. The steps to which the disputed element is subjected are, of course, relevant to the issue, but we do not agree that initial assemblage into an artificially identified sub-unit is a step which necessarily precludes a finding of mere assembly.

■■ The Government agrees with the reasoning of the Customs Court and argues that the disputed articles were not "fabricated components." In our view, item 807.00 generally defines "fabricated components" as those components of the whole product which (a) were not subject to "further fabrication," (b) did not lose their physical identity during assembly and (c) were not advanced in value. We do not think that the language "fabricated components" has the separate import for which the Government contends. The only reasonable interpretation of item 807.00 is that all elements that go into the imported final article which meet the conditions the item imposes on the fabricated components are subject to the exclusion it provides.

■ We find that all the articles in issue here meet those requirements. Concededly all are products of the United States and all went into the imported electrolytic capacitors. The meaning of "fabricated" is broad and without doubt applies to the rolls of foil, paper, cellophane tape and plastic insulating film which obviously were manufactured articles. The articles did not lose their physical identity in the capacitor "by change in form, shape or otherwise." As stated in United States v. Baylis Brothers Co., 451 F.2d 643, 646, 59 CCPA 9, C.A.D. 1026 (1971):

The legislative history makes it equally apparent, however, that Congress did not intend to exclude articles from item 807.00 merely because the American components had undergone some change of form or shape. The test specified in item 807.00 is whether the components have been changed in form, shape, or otherwise to such

an extent that they have lost their *physical identity* in the assembled article. The term "physical identity" was used to exclude from item 807.00 those assembled articles whose American components are "chemical products, food ingredients, liquids, gases, powders," and the like. [Footnote omitted.]

Since the only changes in the exported articles were "by being assembled" or "by operations incidental to the assembly," the items have not been "advanced in value" as prohibited by provision (C) of item 807.00.

■ . There remains the matter of whether the items were exported "in condition ready for assembly without further fabrication." In General Instrument Corporation v. United States, 462 F.2d 1156, 59 CCPA 171, C.A.D. 1062 (1972), the court regarded that provision met by fine gold wire which was exported on spools and in assembly was bonded at the end to an aluminum strip on a semiconductor chip and then severed. The paper in the present case, and the cathode foil in one form of capacitor, were cut to length after being at least partly assembled into the capacitor roll and thus met the provision in question in the same manner as the gold wire in the cited case. Although the anode foil, the cathode foil in some cases, the metal tabs and the Mylar film were cut to length before assembly with the other articles, we find no reason for considering them subject to any different treatment than the articles cut after assembly. Trimming of the edges of the anode foil amounts to an operation incidental to the assembly process and not to "further fabrication" under item 807.00. See C. J. Tower & Sons of Buffalo v. United States, 62 Cust.Ct. 643, 304 F.Supp. 1187, C.D. 3840 (1969), wherein trimming the edges of a composite sheet assembled abroad was not found to bar treatment under item 807.-00.

The Government quotes the following statement from the Tariff Classification

Study, Seventh Supplemental Report, 1963, at page 103:

> Item 807.00—Imports assembled with U. S. components. Item 807.00 contemplates that, when a finished component of U. S. origin is sent abroad and there assembled—without otherwise changing its condition— with one or more other components, the cost or value of such U. S. component shall not be included in the dutiable value of the assembled article in which it has been incorporated. U. S. wire and tape, on spools, sent abroad where they are cut to length and then assembled with other components into a finished article are not finished components the cost of which may be deducted from the dutiable value of the imported article.

It advances this statement as showing legislative intent to exclude wire cut from spools, and the foils, tabs and tapes cut before assembly in this case, from item 807.00 treatment. However, appellant points out the statement appears as part of a summarization, made *after* adoption of the provisions of the Tariff Schedules by Congress, of expressions of the Commission's intentions with respect to such provisions. Appellant also points out that the statement was made *prior* to the Tariff Schedules Technical Amendment Act of 1965, Pub. L. 89–241 which amended original item 807.00 and that the Committee on Ways and Means explained that a purpose of the amendment, which introduced the term "fabricated components," was to correct the situation in which "minor operations such as painting incidental to assembly abroad may be precluded." [4] Under the circumstances, we agree with appellant that the quoted statement is not a significant indication of the legislative intent as to the language of item 807.00 applicable here.

The Government also argues that the cited *General Instrument* and *Baylis Brothers* decisions of this court are not controlling because the articles in question were stipulated to be fabricated components. Nevertheless, we think the reasoning in those cases is applicable here and that the articles in dispute here clearly qualify as fabricated components under item 807.00.

The decision and judgment of the Customs Court is reversed.

Reversed.

4. H.Rep. 342, 89th Cong., 1st Sess. (May 12, 1965), p. 48, U.S.Code Cong. & Admin.News 1965, p. 3416.