**LOCKHEED PETROLEUM SERVICES, LTD., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Consol. No. 77-9-03991.**

United States Court of International Trade.

July 21, 1982.

Shaw and Stedina, New York City (Charles P. Deem, New York City, at trial and on briefs), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Lit. Branch, New York City (Jerry P. Wiskin, New York City, at trial and on briefs), for defendant.

RAO, Judge:

This case involves a manifold centre, manufactured by the plaintiff in Canada and imported into the United States on October 11, 1974 for incorporation into the vessel M/C BASE by Delta Shipyards in Homer, Louisiana in 1975. The M/C BASE was built by the plaintiff, a Canadian corporation, to be used for oil exploration in a permanent installation on the continental shelf in the Gulf of Mexico.

Prior to the importation of the manifold centre, the plaintiff applied for and obtained from the U.S. Customs Service (hereinafter Customs) a ruling that the manifold centre would be eligible for drawback under section 313(g) of the Tariff Act of 1930, as amended [19 U.S.C. 1313(g)]. Subsequently, plaintiff obtained a drawback rate, authorizing the drawback of duties on the exportation of the M/C BASE, subject to plaintiff's compliance with the pertinent Customs regulations (19 C.F.R. 22.1 et seq.).

The M/C BASE was completed in August of 1975 and left the port of New Orleans on August 18, 1975 for Block 331 of the Eugene Island area of the outer continental shelf, some 80 miles out from New Orleans in the Gulf of Mexico. On the following day, August 19, 1975, plaintiff filed an abstract of manufacture with the District Director of Customs at New Orleans, required by section 22.4(g), Customs Regulations, 19 C.F.R. 22.4(g), which states:

(g) The builder of a vessel or aircraft upon which drawback is to be claimed under section 313(g), Tariff Act of 1930, shall keep the records provided for in this section so far as applicable. An abstract of such records shall be filed with the collector of customs, at the headquarters port of the collection district in which the vessel or aircraft is built in ample time prior to the first departure of the vessel or aircraft from the United States to enable that officer to have the abstract verified by examination of the vessel or aircraft and the builder's records pertaining thereto.

Plaintiff filed a drawback entry on December 10, 1975, to which a certificate of manufacture and delivery was attached, which contained a declaration signed by the proprietor and the foreman of Delta Shipyards that the duty-paid manifold centre was used in the manufacture of the vessel "MC BASE" which was delivered to Lockheed Petroleum Services, Ltd. on August 18, 1975. Drawback was denied by Customs on February 24, 1977 because section 22.4(g) of the Customs Regulations had not been complied with in that there was no exami-

nation of the vessel prior to its departure and that the vessel did not clear for a foreign port pursuant to 19 C.F.R. § 22.-13(f). Plaintiff sought reconsideration of this denial by letters to Customs of March 5 and June 8, 1976. On March 28, 1977 plaintiff filed protest No. 2002 700082 for review of the refusal to pay drawback. The drawback entry was liquidated on April 8, 1977 and the protest was denied as untimely, having been filed before the entry was liquidated.

Subsequently, additional protests were filed to obtain review of the decision to deny drawback, all of which were denied by Customs, and plaintiff commenced the instant action on September 29, 1977. On January 3, 1978 plaintiff moved to consolidate this action with two other cases and the defendant opposed and requested a stay. Chief Judge Re granted an extension of time for defendant to respond to the motion for consolidation.

Thereafter, on July 10, 1978 the motion to consolidate the three actions was granted by Judge Boe and on January 11, 1979 Judge Ford granted a motion to extend the time for the defendant to answer the complaint. On April 22, 1980 a motion to extend the time for preparation for trial was granted by Judge Watson, and on March 26, 1981 the case was assigned to Judge Rao.[1]

Plaintiff relies on section 313(a) of the Tariff Act of 1930, as amended [19 U.S.C. 1313(a)], which states:

> Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties. . . .

and on section 313(g) of the same act:

> The provisions of this section shall apply to materials imported and used in the construction and equipment of vessels

built for foreign account and ownership, or for the government of any foreign country, notwithstanding that such vessels may not within the strict meaning of the term be articles exported.

Plaintiff takes the position that it has complied with all the pertinent Customs regulations, that the abstract of manufacture arrived at Customs in New Orleans after the M/C BASE had departed from the port of New Orleans through no fault of plaintiff and that it is ready, willing and able to take the Customs officials to inspect the vessel at its present location, if Customs still feels inspection is necessary to certify that the imported manifold centre was indeed incorporated into the exported vessel, using its own facilities to transport Customs officials to the site.

It is defendant's position that drawback was denied due to the failure of the plaintiff to insure that the abstract of manufacture reached Customs before the vessel first left the United States, that it did not clear for a foreign port and that Customs never waived inspection of the vessel to determine that the imported merchandise was used in the manufacture of the M/C BASE.

Defendant also claims that the Customs regulations are mandatory and that compliance with the regulations is a condition precedent to the allowance of drawback of duties; and that drawback is a privilege and not a right, subject to section 313(j) of the Tariff Act of 1930, as amended, which provides:

> (j) Allowance of the privileges provided for in this section shall be subject to compliance with such rules and regulations as the Secretary of the Treasury shall prescribe, which may include, but need not be limited to, the fixing of a time limit within which drawback entries or entries for refund under any of the provisions of this section or section

---

1. Judge Rao is the fifth judge who has participated in this action. On November 17, 1978 Judge Rao called to the attention of the Court that the rule as to the assignment of cases at the discretion of the Chief Judge should be changed and that this court should follow the procedure utilized by the U.S. District Courts, that cases are assigned when filed on a random basis. No action was taken by the Rules Committee at that time, nor when the matter was again raised on March 12, 1981, by letter to all judges.

1309(b) of this title shall be filed and completed, and the designation of the person to whom any refund or repayment of drawback shall be made.

The purpose underlying the granting of drawback of duties is to encourage the production of articles for export in the United States, thus increasing domestic manufactures, increasing foreign commerce and aiding American industry and labor. *United States v. International Paint Co., Inc.,* 35 CCPA 87, 90 (1948); *United States v. The National Sugar Refining Co.,* 39 CCPA 96, 99, C.A.D. 470 (1951). Thus, the salubrious effect of the grant was to benefit many segments of American commerce and was intended by Congress and recognized by the courts. Provisions relating to drawback were made by the Tariff Acts of October 1, 1890, c. 1244, § 25, 26 Stat. 617, and the Tariff Act of August 27, 1894, c. 349, § 22, 28 Stat. 551, for example.

In *Campbell v. United States,* 107 U.S. 407, 2 S.Ct. 759, 27 L.Ed. 592 (1882), one of the earliest cases in which the Supreme Court decided a Customs case involving drawback of duties, the Court upheld the claim. It concerned linseed oil from Calcutta which was manufactured into linseed cakes in this country and then exported to London. Despite the fact that the Customs regulations then in effect dealing with drawback of duties had been complied with by the plaintiff, the collector did not issue the drawback certificate which would entitle the plaintiff to payment of drawback, presumably by order of the then Secretary of the Treasury. In deciding that Treasury could not defeat the plaintiff's drawback claim, the Court, speaking through Mr. Justice Miller, found an implied contract between the government and the importer for the payment of the drawback, based, not on the Customs regulations, but on the act of Congress establishing the drawback of duties (12 Stat. at L. 292):

[T]he facts found in this case raise an implied contract that the United States will refund to the importer the amount he paid to the Government.

\* \* \* \* \* \*

The act of Congress having declared that on exportation there shall be allowed a drawback equal in amount to the duty paid on such material, and the Secretary having established by a regulation that, as regarded the cake resulting from the manufacture of the linseed into oil and cake, the latter represents at seventeen cents per hundred pounds the duty on the imported seed so converted into cake, there resulted a contract that when exported the Government would refund, repay, pay back, this amount as a drawback to the importer. If this be not so, it is because it is impossible to make a contract when the details of its *execution* or *performance* are left to officers who refuse to carry them out.

So it is ... clear that this claim is founded on the law allowing drawback.

Over the years, the courts have held that the allowance of drawback is a privilege and compliance with the regulations is a prerequisite to securing it where the regulations are authorized and reasonable. *United States v. Ricard-Brewster Oil Co.,* 29 CCPA 192, C.A.D. 191 (1942); *Garret-Hewitt International et al. v. United States,* 65 Cust.Ct. 656, C.D. 4154 (1970).

Plaintiff entered into its contract to construct the M/C BASE in this country because it believed that it would be entitled to drawback on the manifold centre imported from Canada. In communications with Customs, it established a drawback rate and proceeded to comply with the applicable customs regulations. It was prevented from complete compliance with Customs Regulation 22.4(g) only by reason of the unforeseen, injurious and unfortunate occurrence that the United States Postal Service did not deliver the abstract of manufacture until after the departure of the M/C BASE from the United States, albeit only by hours.

Plaintiff stands ready, willing and able to offer its facilities to Customs for an inspection of the vessel to ascertain that the imported manifold centre was indeed incorporated into the M/C BASE.

Section 1585 of the Customs Courts Act of 1980 reads as follows:

The Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States.

By virtue of section 701(a) of that act, as amended by Public Law 96–542, December 17, 1980, this grant applies with respect to civil actions pending on the effective date of the act, November 1, 1980. Thus, the court has the power to grant equitable relief in this civil action.

The applicable Customs regulation, 19 C.F.R. 22.4(g), requires that the abstract of manufacture should have been filed with Customs prior to the first departure of the vessel from the United States. In this case the vessel departed from the port of New Orleans for the Gulf of Mexico the date prior to the receipt of the abstract of manufacture, which had been mailed from New York by the attorney for plaintiff.

The affidavit of Mr. Charles P. Deem, attorney for plaintiff, sworn to on October 22, 1980 (Exhibit 5) states in part:

> In early January, 1976, I conferred in New Orleans with three Customs drawback officials regarding drawback entry 214736, and was advised in effect that although the shipbuilders abstract required by Section 22.4(g), Customs Regulations, was not received by Customs until a short time after the M/C BASE was towed out of the Port of New Orleans, Customs was not thereby prejudiced since, in light of the available records, the nature of the vessel and the drawback material involved, examination of the M/C BASE was not necessary for verification of the abstract.

> That at the same time, I advised those officials of the availability of the M/C BASE for examination, at plaintiff's expense, and Customs' convenience, at its location in the Gulf, utilizing plaintiff's Service System, including its tethered submersible diving bell type personnel capsule.

■■■ One of the first maxims in equity is that "equity looks to the intent rather than to the form" and "it is only by looking at the intent rather than at the form that

equity is able to treat as done that which in good conscience ought to be done." Equity always attempts to weigh the substance of things, and to ascertain, uphold and enforce rights and duties which spring from the real relations of parties. It will not suffer the mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction. Pomeroy, *Equity Jurisprudence,* § 378, Vol. 2, pp. 40, 41.

The intent and substance of the drawback statute is that the importer of articles of commerce who can establish that the articles were subsequently exported from this country is entitled to receive a drawback (or refund) of the duties paid in importation, provided the applicable Customs regulations have been complied with. In *Bartlett v. Kane,* 57 U.S. (16 How.), 14 L.Ed. 931 (1853), Mr. Justice Campbell stated:

> The provisions for the return of the duty upon an exportation from a part of the system of regulations for importations and revenue from the earliest period of our government, and has always been understood to establish relations between the regular and honest importer and the government.

The legislative history of section 313(g), originally enacted by Congress as part of the Tariff Act of 1909, indicates that the provision was intended to encourage American industry and assist American labor. The hearings before the Committee on Ways and Means of the House of Representatives, 60th Congress, on December 4, 1908, produced this comment from Representative Lovering of Massachusetts:

> First. Provision for the allowance of drawback on article of domestic manufacture, made in whole or in part from imported duty-free materials used in the construction and equipment of vessels built for foreign account and ownership and for the foreign trade. It has been ruled by the Treasury Department that the present law can not be so construed as to authorize the payment of drawback under such conditions. In the testimony of Edwin A. Cramp, he included the following decision of the Treasury Depart-

ment to show the urgent necessity for the amendment desired by the shipbuilding industry:

Treasury Department, July 7, 1899

Gentlemen: Replying to your inquiry of the 3rd instant, whether drawback under section 30 of the act of July 24, 1897, will be allowed on boiler tubes manufactured by the Shelby Steel Tube Company, of Cleveland, Ohio, from imported Swedish billets and intended to be used in the construction of boilers for two Russian battle ships, now being built by Messers. Cramp & Sons Company, of Philadelphia, I have to inform you that no drawbacks of duties under section 30 of the act of July 24, 1897, can be allowed on the boiler tubes in question as the use thereof in the construction of the boilers for the battle ships referred to can not be considered an exportation within the meaning of section 30.

Mr. Cramp then called attention to section 12 of the Dingley Act, which provides for the importation, free of duty, of all materials and articles necessary in the construction of vessels built in the United States for foreign account and ownership and for the foreign trade, on which he comments as follows:

Under this law foreign manufacturers who either pay no duty on their materials, or who receive a drawback on the exportation of their goods to the United States, can sell to American shipbuilders absolutely free of duty, while domestic manufacturers employing American labor, who are compelled to import materials from abroad, are denied a refund of the duties thereon when their goods are sold and used for a similar purpose.

This is a serious discrimination against American labor, American manufacturers, and American shipbuilders, and should receive immediate consideration by Congress.

This evidences an intention on the part of Congress to assist American industry through allowing the benefits of drawback to be liberally applied.

■ Equity will also act to give relief in case of accident. This term was defined by Elias Merwin in his treatise, *Equity and Equity Pleading*, at p. 212 as "an unforeseen and injurious occurrence, not attributable to mistake, negligence or misconduct, against the consequences of which a court of law affords no adequate redress." Mr. Justice Story has defined accident (1 *Story's Eq.* § 78) as "such unforeseen events, misfortunes, losses, acts or omissions as are not the result of any negligence or misconduct in the party."

■ In this case the regulations cannot be complied with, there being no further opportunity for the vessel, M/C BASE, to again leave the United States for the first time. The unforeseen occurrence was the delay in mail delivery which resulted in the abstract arriving within hours of the departure of the M/C BASE. It has been stated in equity that where a duty is created by law, the party will be excused from performing it if disabled without his own fault:

When the law creates a duty, and the party is disabled from performing it without any fault of his own, the law will excuse him. *Mill Dam Foundry v. Hovey,* 21 Pick. 417, 441.

The failure of the plaintiff to comply with Customs Regulation 22.4(g) was occasioned by slow mail delivery, late less than 24 hours.[2] The abstract of manufacture arrived at Customs less than 24 hours after the M/C BASE left the port of New Orleans. This constitutes an unforeseen event, misfortune or omission not the result of any misconduct on the part of the party and is within the purview of the term "accident" as contemplated by Mr. Justice Story, *supra.*

---

**2.** See the affidavit of Kerry Chavin attached to plaintiff's memorandum in opposition to defendant's cross-motion for summary judgment in which he states that the abstract of manufacture was sent to plaintiff's attorney on August 13, 1975 in the belief that it would be received by him and filed with the District Director of Customs at New Orleans in sufficient time to allow for inspection of the vessel by Customs.

There is also an element of forfeiture under the facts in this case in that the drawback claim of the plaintiff was established with Customs long before the merchandise was incorporated into the M/C BASE. There was long communication between plaintiff and Customs in establishing the right to drawback and plaintiff relied on the representations of Customs that drawback would be allowed, only to be told later that the drawback would be disallowed (or forfeited) because the abstract arrived 24 hours late.

This court, acting within its equity jurisdiction, finds that the abstract of manufacture was prevented from being timely delivered to the Customs Service at New Orleans by reason of an accident not attributable to misconduct on the part of plaintiff and that relief should be granted.

The certificate of manufacture and delivery (Customs form 7757–A) attached to the drawback entry received into evidence without objection at the trial of this action contains the statements of Ralph A. Arcenal, proprietor of Delta Shipyard, and of Kerry Chauvin, project manager and foreman of Delta Shipyard, to the effect that an imported manifold centre was imported by Lockheed Petroleum Services on October 11, 1974 and was incorporated into the vessel identified as the "MC BASE." Defendant made no objection to this document and it has been received as part of the record of this case. The court finds it to be sufficient proof that the imported merchandise was used in the manufacture of the M/C BASE.

■ The defendant has admitted that the M/C BASE has been exported and this court so holds [see page 16 of defendant's post trial brief]. However, defendant also relies on the fact that the vessel did not clear for a foreign port as required by Customs Reg. 22.13(f). Again, the statute, 19 U.S.C. 1313(g), which applies to materials for the construction of equipment for vessels, provides:

The provisions of this section shall apply to materials imported and used in the construction and equipment of vessels built for foreign account and ownership, or for the government of any foreign country, notwithstanding that such vessels may not within the strict meaning of the term be articles exported.

The requirements of the statute are satisfied if the imported materials are used in the construction and equipment of vessels built for foreign account and ownership. Plaintiff is a Canadian corporation and the M/C BASE was built for its account and ownership, so the statutory requirements are satisfied. As to the Customs regulation that requires a vessel to clear for a foreign port, it is more applicable to actual vessels which are to be used in navigation than to a manifold centre base which is to be used in oil exploration in a permanent installation on the continental shelf. While it is possible that the M/C BASE could have been cleared for a foreign port for the sole purpose of satisfying the regulation, the law will not require a useless act, and this court is satisfied that plaintiff has satisfied the requirements for drawback on the manifold centre now part of the M/C BASE.

■ We come lastly to defendant's claim that Court No. 77–9–03991 should be severed from the instant consolidated action and dismissed because the protest was filed before the entry was liquidated, pursuant to section 514(c)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. 1514(c)(2), which states:

A protest of a decision, order, or finding described in subsection (a) shall be filed with such customs officer within ninety days after but not before—

(A) notice of liquidation or reliquidation, or

(B) in circumstances where subparagraph (A) is inapplicable, the date of the decision as to which protest is made.

Court No. 77–9–03991 was consolidated with two other civil actions dealing with the same facts and issues, by order of this court. Court No. 77–12–04815 covering Protest No. 2002 27000112 filed April 25, 1977 would not be subject to dismissal, as the protest was filed after the entry was liquidated on April 8, 1977. This court ac-

cordingly severs and dismisses Court No. 77–9–03991 and decides the issues involved herein in favor of plaintiff under Court No. 77–12–04815, under equitable principles.

In the interest of justice, it is the decision of this court that the plaintiff is entitled to drawback of duties for the manifold centre imported into the United States by plaintiff, which was incorporated into the vessel M/C BASE. Judgment is entered for plaintiff.